CONSUMERS POWER COMPANY, a
Michigan Corporation, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants,

and

General Motors Corporation,
Intervenor-Defendant.

LOWELL LIGHT AND POWER BOARD,
a Municipal Utility, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants.

The DOW CHEMICAL COMPANY, a
Delaware Corporation, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants.

OWENS–ILLINOIS, INC., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants.

MICHIGAN PUBLIC SERVICE
COMMISSION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, Defendants.

CELANESE CORPORATION et
al., Plaintiffs,

v.

FEDERAL ENERGY ADMINISTRATION
et al., Defendants.

Civ. A. Nos. 5–72000, 5–72030, 5–72093,
5–72104, 5–72171, 75–1518.

United States District Court,
E. D. Michigan, S. D.

March 5, 1976.

Patricia N. Blair, U. S. Dept. of Justice, Scott H. Lang, Federal Energy Administration, Washington, D. C., Thomas M. Woods, Asst. U. S. Atty., Detroit, Mich., for Federal Energy Administration and Frank G. Zarb.

William Bode, Batzell, Nunn & Bode, Terrence Murphy, Wald, Harkrader & Ross, Washington, D. C., James D. Tracy, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., O. K. Petersen, Consumers Power Co., Jackson, Mich., for Consumers Power Co.

Edward J. Grenier, Jr., Ronald L. Winkler, Sutherland, Asbill & Brennan, Washington, D. C., Douglas West, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for General Motors Corp.

P. D. Conner, Ann Arbor, Mich., Leslie F. Nute, Midland, Mich., for Dow Chemical Co.

R. Gordon Gooch, Tucker W. Peterson, Baker & Botts, Washington, D. C., for Celanese Corp.

Philip McWeeny, Toledo, Ohio, Keith R. McCrea, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D. C., Daniel G. Wyllie, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for Owens-Illinois, Inc.

James E. Riley, Asst. Atty. Gen., Lansing, Mich., for Michigan Public Service Commission.

Peter W. Steketee, Freihofer, Cook, Hecht, Oosterhouse & DeBoer, Grand Rapids, Mich., for Lowell Light and Power Bd.

## OPINION AND ORDER

JOINER, District Judge.

■ Consumers Power Company is a public utility organized under the laws of Michigan, which sells electricity and natural gas within Michigan. It has moved the court for issuance of a preliminary injunction against implementation of portions of an order by the Federal Energy Administration (FEA) granting Consumers' request for an allocation of natural gas liquids as a feedstock for the production of synthetic natural gas.[1] A preliminary injunction is extraordinary relief which will not be granted unless the movant sustains a substantial burden of proof. This burden requires a showing of imminent, irreparable harm and a substantial likelihood of success on the merits. The court must also consider the public interest and any inconvenience that might be caused the opposing party. *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

■ Although Consumers has raised numerous issues in its complaint,[2] the only

---

1. Jurisdiction of this case exists under the Federal Energy Administration Act of 1974 (FEAA), §§ 7(i)(2)(B), 8(f), 15 U.S.C. §§ 766(i)(2)(B), 767(f); the Economic Stabilization Act of 1970, § 211(a), (d)(2), 12 U.S.C. § 1904 (note), as incorporated by the Emergency Petroleum Allocation Act of 1973 (EPAA), § 5(a)(1), 15 U.S.C. § 754(a)(1); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. It is not necessary to determine whether the FEA order under review in this case is an "order having the applicability and effect of a rule," 15 U.S.C. § 766(i)(1)(A), as "rulemaking" in this case, if there was any, was done under the authority of the EPAA, and is therefore excepted from the requirement that judicial review of FEA rule making may be had only in the appropriate United States Court of Appeals, 15 U.S.C. § 766(i)(2)(A).

2. Because many of the issues raised in its complaint are presently pending before the FEA's appeal board on review, Consumers does not now seek to review "the substance or the factual underpinnings of the FEA's order. [Plaintiff] simply seeks to have the FEA's lack of jurisdictional basis declared . . . ." Plaintiff's Memorandum in Opposition to Motion to Dismiss Filed by General Motors Corporation, at 7–8. The following issues, which were raised in plaintiff's amended complaint, are not now before the court:

    (a) Whether the findings of the challenged order lack a foundation in substantial evidence.

    (b) Whether the FEA failed to analyze the economic impact of its order, as required by agency regulations.

issues now before the court are (1) whether the FEA acted in excess of its authority in allocating natural gas liquids to Consumers as a feedstock for the production of synthetic natural gas; and (2), if it did not exceed its authority in so allocating natural gas liquids, whether it exceeded its authority in conditioning future allocations on Consumers' compliance with certain notice requirements concerning the distribution and pricing of natural gas and synthetic natural gas produced from the allocated natural gas liquids.

Although these claims are not now before the court for final disposition, the court has attempted to analyze them for the purpose of determining whether there is a substantial likelihood of Consumers' ultimate success. It is the opinion of the court, at this time, that the FEA did not exceed its authority, and therefore Consumers has failed to show the substantial likelihood of success on the merits that is essential for a preliminary injunction.

## I. PROCEDURAL HISTORY

The history of this lawsuit is almost as old as the legislation which gave rise to it. The Emergency Petroleum Allocation Act (EPAA) became effective on November 23, 1973, and on February 22, 1974, Consumers applied for an exception from FEA regulations issued under that Act [3] for the Canadi-

---

(c) Whether an environmental impact statement was required by the National Environmental Policy Act of 1974.

Other issues have been presented in the five other cases that were consolidated ,with this case for pretrial purposes, but these issues are not presently before the court.

Consumers also seeks to enjoin the FEA order on the ground that its terms require Consumers to place in jeopardy its contracts with present and future customers and expose Consumers to liability for damage claims by such customers, all in violation of the due process guarantees of the Fifth Amendment.

Section 211(g) of the Economic Stabilization Act, governing actions under the EPAA, states in part that:

"The Temporary Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Temporary Emergency Court of Appeals, shall have exclusive jurisdiction to determine the constitutional validity of any provision of this title or of any regulation or order issued under this title. Except as provided in this section, no court, Federal or State, shall have jurisdiction or power to consider the constitutional validity of any provision of this title or of any such regulation or order, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this title authorizing the issuance of such regulations or orders, or any provision of any such regulation or order, or to restrain or enjoin the enforcement of any such provision."

Section 211(c) provides in part that:

"In any action commenced under this title in any district court of the United States in which the court determines that a substantial constitutional issue exists, the court shall certify such issue to the Temporary Emergency Court of Appeals."

The jurisdiction of this court is therefore limited to determining whether Consumers has stated a substantial constitutional issue.

The court has concluded that no substantial constitutional issue has been stated. Assuming, for the moment, that the FEA had the authority to issue its order of December 12, 1975, the terms of that order are well within the bounds of constitutionally permissible economic regulation. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *De Rieux v. The Five Smiths, Inc.,* 499 F.2d 1321, 1334 (Em.App.1974), *cert. denied sub nom., Five Smiths, Inc., v. Hollaway,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *IBEW, Local 11 v. Boldt,* 481 F.2d 1392, 1395–96 (Em.App.1973).

Consumers' fears of massive damage claims are groundless, since impossibility of performance caused by an intervening order of a governmental administrative agency is normally a good defense to a breach of contract action. See 6 *Corbin on Contracts* § 1346, at 433–34 (1962). Congress' attitude toward actions of this kind was made clear in the 1975 amendment to section 6(c) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 755(c), which made compliance with any order promulgated under that Act a complete defense to any breach of contract action based upon delay or failure to perform contracts for the sale or exchange of "crude oil, residual fuel oil, or any refined petroleum product." Energy Policy and Conservation Act § 453, 89 Stat. 949.

Since the court holds that Consumers has failed to present a substantial constitutional issue, it is not required to certify the constitutional issue to the Temporary Emergency Court of Appeals for review.

3. On January 15, 1974, the Federal Energy Office, the predecessor of the Federal Energy Administration, issued its Mandatory Petroleum Allocation Regulations, 10 C.F.R. part 211, and Mandatory Petroleum Price Regulations, part 212, without providing for the allocation of petroleum products to synthetic natural gas plants.

an natural gas liquid feedstocks that it was using for the production of synthetic natural gas at its new plant in Marysville, Michigan. Interim relief was granted to Consumers, but subsequently the FEA issued a regulation governing assignments of feedstocks to synthetic natural gas plants,[4] and on October 8, 1974, Consumers petitioned the FEA for an assignment of a base period volume for its natural gas liquid feedstocks to the Marysville plant.

*The FEA Order of May 9, 1975.* On May 9, 1975, and as modified in a supplemental order on May 21, 1975, FEA granted Consumers' petition. Finding that Consumers needed feedstocks other than naphtha, and that such alternate sources of gas as liquified natural gas, imported methanol, and coal gasification were not available to Consumers, the FEA assigned more than 18,-420,000 barrels of propane, butane, and natural gasoline to Consumers,[5] on condition that the propane content of the feedstock stream to the gasification units was not to exceed 30 percent by volume. In addition, Consumers was to terminate, within one year, all "interruptible service" to its customers "which have alternate capability on a continuing basis."

*The FEA Decision of September 16, 1975.*[6] Consumers appealed the portions of the order limiting the propane content of the feedstock stream to 30 percent at the gasification unit level and conditioning the allocation on termination of service to interruptible customers with alternate fuel supplies on a continuing basis. It argued that the FEA lacked authority under the Emergency

Petroleum Allocation Act to allocate natural gas liquids; that the FEA lacked authority to regulate the distribution or sale of natural gas, and therefore could not condition an allocation of natural gas liquid feedstocks on a requirement that Consumers terminate natural gas service[7] to its interruptible customers; that the FEA could not order termination of ` service to interruptible customers without first issuing an environmental impact statement; that the FEA failed to consider the impact of its order on market area employment opportunities, as required by its own rules; that the FEA had not identified with sufficient clarity the customers who would be affected by the termination order and the types of service that Consumers would be required to curtail; and that the FEA had failed to consider or indicate the effect of state law regulating the intrastate sale and distribution of natural gas.

On the 30 percent limitation on the propane content of the feedstock stream, the FEA appeal board agreed to strike the words "gasification units" from the order, and Consumers does not raise this issue before the court. On the scope of its jurisdiction, the FEA held that there was no merit to the contention that it lacked authority to allocate NGL's. Conceding that it lacked authority to regulate natural gas, it further held that it did not exceed its authority in conditioning its allocation of NGL's to Consumers on a requirement that Consumers terminate natural gas service to customers with alternative means of satisfying their energy needs. It characterized

---

**4.** On May 6, 1974, the Federal Energy Office revised its regulations to designate the allocation priority status of producers of synthetic natural gas. Regulation 211.29, which was promulgated at that time, allowed assignments or adjustments to base period volume to synthetic natural gas producers having no base period volumes or needs greater than their base period volumes.

On August 2, 1974, the newly constituted FEA issued a Statement of Policy on the allocation of petroleum products to synthetic natural gas plants, 39 Fed.Reg. 27910 (1974), accompanied by Special Rule No. 1, setting forth the FEA's criteria for allocating petroleum products as feedstocks to synthetic natural gas plants under Regulation 211.29. 10 C.F.R. 211.29 App. (1975).

**5.** This allocation allowed Consumers the total amount of NGL feedstocks that it had requested and was sufficient for full plant operation.

**6.** Case No. FEA–0460. The opinion of the FEA's Office of Exceptions and Appeals is reported at CCH Energy Management [1975 Transfer Binder], ¶ 80,682.

**7.** Consumers uses the synthetic natural gas produced at Marysville to supplement its natural gas supply by commingling it with natural gas in a ratio of approximately 80 percent natural gas to 20 percent synthetic natural gas.

this aspect of the order as having an "indirect effect" on the distribution of natural gas within Michigan. Finally, the FEA dismissed the contention that the assistant administrator had failed to make findings on the impact of his order on market area employment opportunities by noting that he was not required by the rules to make written findings on this subject, and that Consumers had failed to show that such findings would have presented a basis for altering the administrator's ultimate determination.

The FEA remanded the order for clarification of its terms and for assessment of the impact of state law, for the purpose of avoiding any conflict with state law. On remand, the assistant administrator was also to make further findings and conclusions on the necessity of an environmental impact statement.

*The FEA Order of December 12, 1975.* On December 12, 1975, the assistant administrator issued a decision which substantially modified the May 21, 1975 order. He rescinded the earlier requirement that Consumers terminate service to "interruptible" customers within one year and substituted certain notice requirements. In addition, he added certain requirements that had not been referred to at all in the earlier order:

"(5)(a) Within 45 days of this Order, Consumers shall notify in writing all its customers who are in FPC categories four through nine or who would be in FPC categories four through nine if they were subject to FPC jurisdiction, that Consumers may be required to terminate service on January 1, 1977 to those customers with alternate fuel capabilities on a continuing basis or to those customers which service firms with alternate fuel capabilities on a continuing basis in order to receive SNG feedstock allocations. Such notice shall indicate that FEA may presume that Consumers' customers or their customers in FPC categories four through nine have such alternate fuel capabilities unless they certify in writing to Consumers within 90 days of this Order, that they have no such alternate fuel

capabilities, that they do not reasonably anticipate that they will have such alternative fuel capabilities by January 1, 1977, and the reasons why they believe they do not now or will not by January 1, 1977 have such alternate fuel capabilities.

(b) Within 60 days of this Order, Consumers will certify in writing to FEA that it has provided the notice required by paragraph 5(a) of this Order; and

(c) Within 120 days of this Order, Consumers will provide FEA with data indicating the number of firms which it or its customers service which are in FPC categories four through nine or which would be in FPC categories four through nine if they were subject to FPC jurisdiction, the volume of pipeline gas and SNG which Consumers anticipates serving each of these firms in 1976 and 1977, and the identity of those firms which have alternate fuel capability on a continuing basis or which failed to respond to the notice requesting this information;

"(6) On or before June 1, 1976, Consumers shall provide FEA with information describing in detail the nature and extent of its incremental pricing of SNG, its efforts to obtain any necessary approval from appropriate regulatory authorities for full incremental pricing of SNG, and the results of its meetings with appropriate FEA and other officials as to the nature and extent of incremental pricing which it should implement or seek to implement;

"(7) On or before June 1, 1976, Consumers will provide FEA with data concerning new customers which it accepts after December 1, 1975, increased service to customers existing on December 1, 1975 including volumes, prices and service categories, Consumers' efforts to encourage installation of alternate fuel capability on a continuing basis by its customers or their end-users and whether any new end-users could use alternate fuels on a continuing basis;

*       *       *       *       *       *

"(9) Failure to comply with the provisions of this Order may, among other actions, occasion FEA's revocation, revision or modification of this Order and may delay or adversely affect FEA's consideration of any petitions by Consumers for allocation of SNG feedstocks after December 31, 1976."

█ The December 12, 1975 order is presently pending on appeal within the agency. However, the court does not at this time make any ruling on the effects of the exhaustion of remedies doctrine, as the only issue now before the court is the scope of the FEA's jurisdiction.[8] As to this question, the FEA acknowledges, as it must, that its decision of September 16, 1975 is a final and appealable order.[9]

## II. THE LEGISLATIVE BACKGROUND

Three recent congressional enactments are involved in the determination of whether the FEA had the authority to regulate Consumers' use of natural gas liquids as feedstocks for the production of synthetic natural gas. The Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. §§ 751–56, enacted in 1973, is the basic jurisdictional statute. Jurisdiction is also asserted under the Federal Energy Administration Act (FEAA), 15 U.S.C. §§ 761–86, which was enacted the following year. The FEAA created the Federal Energy Administration (FEA) and gave it substantial data gathering powers. In late 1975, the Energy Policy and Conservation Act was passed, 42 U.S.C.

§ 6201 note, amending the EPAA in certain respects that are material to this discussion.

The EPAA was Congress' urgent reaction to the energy problems precipitated by the Arab-Israeli hostilities of 1973. In commenting upon recent amendments to the Act, Congress itself remarked upon the atmosphere surrounding the EPAA's enactment:

"In early October 1973 the 'Yom Kippur' war broke out in the Middle East. An embargo was imposed on the United States and other countries by the oil producing Arab countries. Suddenly, the United States was faced with the possibility of drastic shortages in crude oil supplies and spiralling of petroleum costs. In this crisis atmosphere, Congress passed the Emergency Petroleum Allocation Act in 1973 . . . ." U.S.Code Cong. & Adm.News, pp. ——–—— (1975).

The bill was enacted on November 13, 1973.

The hurriedly enacted measure vested the President with the responsibility for dealing with shortages of crude oil, residual fuel oil, and refined petroleum products and with dislocations in their distribution. The congressional purpose was to minimize "the adverse impacts of such shortages or dislocations on the American people and the domestic economy."[10] The President was to promulgate regulations providing for the mandatory allocation and pricing of these products,[11] for the purpose of meeting specified goals, which are set out in the margin.[12] These goals are very broad, and,

---

8. See note 2 *supra.*

9. Although the FEA remanded the portion of the May 21 order that conditioned the allocation on termination of natural gas services to certain customers, it expressly held that it had the authority not only to allocate natural gas liquids, but also to attach the condition that the assistant administrator had attached to the May 21 order.

10. EPAA § 2, 15 U.S.C. § 751(b).

11. EPAA § 4(a), 15 U.S.C. § 753(a).

12. EPAA § 4(b)(1), (3), 15 U.S.C. § 753(b)(1), (3), provide that:

"(b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster

inevitably, mutually contradictory. The House Committee [13] therefore directed the FEA to exercise its discretion in administering the Act:

> "[T]he Committee has not attempted to fashion a mandatory allocation program of its own conception. The petroleum industry is one of the largest and most complex in the world. To freeze in statutory terms an allocation program for this industry would simply not be good policy. Administrative flexibility is a prerequisite and, consequently, the Committee has decided to recommend that the Executive be assigned the responsibility for crafting the program pursuant to Congressionally defined (though generally stated) objectives." H.R.Rep. No. 93–531, 93d Cong., 1st Sess., 2 U.S.Code Cong. & Ad.News, pp. 2582, 2589 (1973); see Conf.R. No. 93–628, id. 2688.

The Conference Committee reiterated, in its report, that "[t]he President is intended to have full flexibility in devising the most effective and efficient means of meeting the priority needs of the American people identified in section 4(b)." [14]

competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

Enactment of the FEAA one year later established a structure for administering and coordinating the nation's energy programs and gave to that agency broad powers for data gathering and analysis. [15] The FEA had become necessary, declared Congress, because:

> "the general welfare and the common defense and security require positive and effective action to conserve scarce energy supplies, to insure fair and efficient distribution of, and the maintenance of fair and reasonable consumer prices for, such supplies, to promote the expansion of readily usable energy sources, and to assist in developing policies and plans to meet the energy needs of the Nation." FEAA § 2(a), 15 U.S.C. § 761(a).

The responsibilities for energy management vested in the President under the EPAA and FEAA were not narrow and circumscribed. These acts were broad mandates requiring the use of judgment and discretion in dealing with the nation's complex and constantly changing energy needs. *Air Transport Association of America v. Federal Energy Office*, 382 F.Supp. 437, 447

\* \* \* \* \* \*

> "(3) The President in promulgating the regulation under subsection (a) of this section shall give consideration to allocating crude oil, residual fuel oil, and refined petroleum products in a manner which results in making available crude oil, residual fuel oil, or refined petroleum products to any person whose use of fuels other than crude oil, residual fuel oil, and refined petroleum products has been curtailed by, or pursuant to a plan filed in compliance with, a rule or order of a Federal or State agency, or where such person's supply of such other fuels is unobtainable by reason of an abandonment of service permitted or ordered by a Federal or State agency."

13. The bill finally enacted was the Senate version, after much of the House version had been substituted for its language.

14. Conf.R. No. 93–628, 2 U.S.Code Cong. & Ad.News, pp. 2688, 2689 (1973).

15. 15 U.S.C. §§ 761–86.

(D.D.C.1974), *aff'd,* 520 F.2d 1339 (Em.App. 1975).

## III.  NATURAL GAS LIQUIDS

Natural gas consists of a mixture of hydrocarbons and non-hydrocarbons that is found in gaseous form below the surface of the earth, often associated with petroleum. The principal constituents of natural gas are methane and ethane, the two lightest hydrocarbons. Liquified petroleum gas (LPG) is a gaseous mixture consisting of propane or propane and butane, with some ethane. It is a somewhat heavier hydrocarbon mixture than natural gas and can be liquified under moderate pressure at normal temperature. Propane and butane, the principal constituents of LPG, may also be refined from crude oil at crude oil refineries. The end product is then known as liquified refinery gases (LRG), rather than as LPG. There is substantial overlapping of the constituent hydrocarbons from one petroleum product to the next. See Appendix.

"Natural gas liquid" is a term that is not uniformly defined. It refers generally to a hydrocarbon mixture, gaseous in the reservoir, which encompasses several petroleum products—primarily, however, LPG and natural gasoline.[16] It contains no methane and little ethane, and the two principal constituents of natural gas. It is recovered from "wet" natural gas found in oil reservoirs, in gas reservoirs overlaying oil reservoirs, and in "nonassociated" gas reservoirs.

Natural gas liquid found in wet natural gas is usually fractionated into the component petroleum products, after the heaviest hydrocarbons have been removed, at natural gas processing plants. The gas that remains consists primarily of methane and ethane, which is then sold as "dry" natural gas. Natural gas liquid is also marketed, without having been fractionated, as petrochemical[17] feedstocks and feedstocks for the production of synthetic natural gas, which is identical for all practical purposes with natural gas. Production of natural gas liquid accounts for approximately 15 percent of total petroleum production in the United States and 6 percent of total refinery input.

## IV.  THE NECESSITY FOR REGULATION

In a statement of policy issued with its Special Rule No. 1, setting forth in detail the criteria to be considered in allocating feedstocks for the production of synthetic natural gas,[18] the FEA stated that natural gas remains the source for 33 percent of the nation's total energy needs and is in seriously short supply.[19] Many natural gas distributors have been forced to implement curtailment plans, and the FEA believes that such alternative means of supplementing the energy supply as coal gasification, importation of liquified natural gas, and shipment of Alaskan gas are several years away from realization.[20] Synthetic natural gas, in the FEA's opinion, is a feasible interim[21] supplemental energy supply, and the FEA has therefore established a procedure for allocating feedstocks to synthetic natural gas plants.[22]

---

16.  *See* H. R. Williams & C. J. Meyers, *Manual of Oil and Gas Terms* 280 (Bender 3d ed. 1971). Natural gasoline is a mixture of pentane and other heavier hydrocarbons which is gaseous in the reservoir but which liquifies at the surface due to reductions in pressure and temperature. It is to be distinguished from refined gasoline, which is clearly subject to regulation under the EPAA.

17.  The petrochemical industry engages in the manufacture of synthetic rubber, synthetic fibers, paints and coatings, pharmaceuticals, plastics, fertilizer, and other consumer and industrial products. It uses feedstocks of natural gas, natural gas liquids, crude oil, and other petroleum products. Thus, it is a competitor with producers of synthetic natural gas for some of the same feedstocks.

18.  See note 4 *supra.*

19.  39 Fed.Reg. 27910 (1974).

20.  *Id.*

21.  The FEA nevertheless believed that energy is lost in producing synthetic natural gas, making it *undesirable as a permanent source of* supplemental energy supply.

22.  See 10 C.F.R. § 211.29 (1975).

Propane is frequently used as a substitute for natural gas, and it is one of the nation's most valuable petroleum resources. However, it remains a scarce commodity.[23] It is the FEA's position, then, that both the importance and relative scarcity of propane make its regulation essential.

Some propane is produced from crude oil,[24] but most of it—70 percent of the total supply—is extracted from natural gas liquid at natural gas processing plants. Thus, if natural gas liquid were not subject to FEA regulation under the Emergency Petroleum Allocation Act, it is conceivable that 70 percent of the nation's propane supply would be marketed completely free of governmental control.

### V. COVERAGE OF NATURAL GAS LIQUIDS UNDER THE EMERGENCY PETROLEUM ALLOCATION ACT

The regulation which was mandated under the EPAA is restricted to "crude oil, residual fuel oil, and each refined petroleum product."[25] "Refined petroleum products" are defined as "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel."[26] "LPG" is defined as "propane and butane, but not ethane."[27]

In 1975, the EPAA was amended by the Energy Policy and Conservation Act to give the President authority to modify or eliminate (*i. e.*, to "decontrol"), *inter alia*, "refined petroleum products as a class (including natural gas liquids and natural gas liquid products, other than propane)."[28]

Natural gas liquid is not a single petroleum product, but a mixture of hydrocarbons which is a feedstock in its own right and which is also separable by mechanical means into a variety of petroleum products. It may be described as a class or family of the petroleum products that are recoverable from it. But because natural gas liquid is multiple, rather than singular in nature, does not mean that it falls outside the category of refined petroleum products.

The most important constituent products in natural gas liquid are LPG and natural gasoline. The final version of the EPAA describes the scope of its coverage in terms of specific petroleum products and, when necessary, the specific hydrocarbons to be regulated. Thus, LPG is specifically enumerated as subject to FEA regulation. Furthermore, propane and butane are specifically enumerated as subject to FEA regulation. Ethane, which is also found in LPG, is specifically exempted from regulation. Natural gasoline is not specifically mentioned, but the FEA has held that it, too, is subject to FEA regulation.[29]

■ In keeping with the general statutory scheme, the FEA orders of May 21 and December 12 were both careful to confine the assertion of FEA jurisdiction to the constituents of Consumers' NGL feedstock stream that were subject to regulation. The assignment was framed in terms of "barrels of propane, butane, and/or natural gasoline." If the order had been framed in terms of barrels of natural gas liquids, the FEA would have violated the statutory prohibition against regulating ethane.

The FEA's approach to the jurisdictional problems in this case was an intelligent approach to a complex and difficult problem. It is an approach which the court believes necessary in order to effectuate the purposes of the EPAA.

---

**23.** The Senate Conference Committee's report accompanying the Energy Policy and Conservation Act notes that "[t]here is no longer a general shortage of either crude oil or refined petroleum products, with the possible exception of propanes [sic]." Sen.Conf.Rep. No. 94–516, at 203, U.S.Code Cong. & Ad.News, pp. ——, ——.

**24.** See Part III *supra*.

**25.** EPAA § 4(a), 15 U.S.C. § 753(a).

**26.** EPAA § 3(5), 15 U.S.C. § 752(5).

**27.** EPAA § 3(6), 15 U.S.C. § 752(6).

**28.** EPCA § 455, *adding new* EPAA § 12(c)(3).

**29.** *National Helium Corp.*, CCH Energy Management [1975 Transfer Binder], ¶ 87.004.

Consumers argues that natural gas liquid is not subject to FEA regulation because such a construction runs counter to the legislative history. It argues that the entire thrust of the Act pertains to "crude oil and *its* refined products."[30]

Consumers relies primarily on the Senate versions of the bill. An early committee version limited the President's regulatory authority to "crude oil (including natural gas liquids)." Apparently, the committee feared that broader coverage would cause conflict with the Federal Power Commission, which is charged with the responsibility of regulating natural gas in interstate commerce. The final Senate version applied to "crude oil (including natural gas liquids) and refined petroleum products (including liquid petroleum gas)" and was accompanied by a finding that there was a national shortage of natural gas liquids. However, the House version of coverage was substituted for the Senate version in the enacted bill. What is significant to Consumers is that the House version contained no specific reference to natural gas liquids,[31] and that the Senate receded from its findings that there was a shortage of natural gas liquids.[32] Consumers argues that this legislative history shows that Congress expressly rejected extension of the Act's coverage to natural gas liquids. Any grant of authority contained in the Energy Policy and Conservation Act was, according to Consumers, of prospective effect only.

The court agrees with Consumers that the legislative history is ambiguous. However, Consumers' narrow statutory construction is not the only statutory construction which is supported by legislative history. There is greater support in the history for the hypothesis that the Senate receded from its finding and agreed to substitute the House's version of coverage because it assumed that natural gas liquids were covered by the House version. This hypothesis, in fact, is supported by the legislative history. When the Conference Committee's bill was before the Senate, its chairman, Senator Henry Jackson, read into the record a letter from the chairman of the Cost of Living Council[33] requesting clarification on whether natural gas liquids were covered by the definition of "crude oil" in the conference version of the bill. Senator Jackson replied that they were covered, and he believed "it was the intent of the conference committee to concur in [this] interpretation."[34]

There is support for the theory that Congress assumed natural gas liquids were included within the meaning of "crude oil, residual fuel oil, and refined petroleum products." For example, the EPAA expressly carried forward regulations promulgated by the Cost of Living Council under the Economic Stabilization Act defining natural gas liquid as a "covered product" under that act.[35] In addition, the 1975 amendments to the EPAA were premised on a congressional assumption that natural gas liquids had been subject to the mandatory allocation provisions of the 1973 Act;[36] any other construction of the "decontrol" provisions of the Energy Policy and Conservation Act would be tortured.

In sum, Congress carried forward the Cost of Living Council's regulations, including a provision defining natural gas liquid as a "covered product," when it enacted the

---

**30.** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, at 13 (emphasis added).

**31.** See EPAA §§ 3(5), 4(a), 15 U.S.C. §§ 752(5), 753(a).

**32.** Conf.Rep. No. 93–628, *supra* note 14, at 2690.

**33.** The Cost of Living Council was the agency initially charged with the duty to regulate the price of petroleum products, under the Eco-

nomic Stabilization Act § 203, 12 U.S.C. § 1904 note.

**34.** 119 Cong.Rec.S. 20398.

**35.** *See* EPAA § 6(a), 15 U.S.C. § 755(a), carrying forward, in particular, 6 C.F.R. 150.342, promulgated under the Economic Stabilization Act § 203(a)(3), 12 U.S.C. § 1904 note.

**36.** EPCA § 455, adding new EPAA § 12(c)(3)(D).

EPAA; the chairman of the conference committee understood the enactment as covering natural gas liquid, despite that committee's deletion of a Senate finding that natural gas liquids were in short supply; and the 1975 amendments to the EPAA gave the FEA authority to "decontrol" natural gas liquids. This legislative history hardly supports the construction that Consumers urges.

It may be noted, too, that the regulation mandated by section 4(a) of the EPAA is not made contingent on supply shortages. The statutory purpose is twofold: to provide the President with "specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products *or dislocations in their national distribution system.*" [37] The objectives set forth in section 4(b)(1) bear primarily on problems of distribution—problems which may, but need not be related to supply shortages. The FEA's responsibilities under the EPAA and the EPCA do not come to an end until there is no longer a supply shortage *and* until there is no longer any danger of dislocations in the distribution of that supply.[38]

If the Act were construed, as Consumers suggests, as restricted to "crude oil and its refined products," this would lead to the incongruous result of subjecting natural gas liquids to FEA regulation according to source: they would be within the scope of the Act if recovered from crude oil, but outside the scope of the Act if recovered from natural gas reservoirs. This would remove up to 70 percent of the nation's propane supply from the regulatory powers of the FEA. Yet the FEA is charged with the mandatory duty to allocate and conserve the nation's reserves of valuable propane. If the FEA is to discharge its duties under the EPAA, it must have the authority to allocate supplies of natural gas liquids at least to the extent that is necessary to allocate propane and butane. The court's construction of the EPAA is consistent with the Act's broad mandate and with the interests of the nation. The legislative history cited by Consumers is not persuasive.

Were there any substantial doubts remaining about the proper statutory construction in this case, they would be resolved in favor of the FEA. That agency has consistently taken the position, in public, that natural gas liquids were subject to its regulation.[39] The deference due to an agency determination of a matter of technical complexity is great. *Estate of Sanford v. Commission*, 308 U.S. 39, 53, 60 S.Ct. 51, 60, 84 L.Ed. 20, 27 (1933). This principal is especially applicable in a case such as this one, where Congress had knowledge of the FEA's assertion of authority to regulate natural gas liquids when it amended the EPAA in 1975, and acknowledged having such knowledge in the amendments.[40]

The considerations set forth above indicate a substantial likelihood that the FEA's assertion of regulatory authority over the natural gas liquid feedstocks in this case was not in excess of that agency's authority. The question remains whether the FEA also had the authority to attach conditions to its allocations that involve the end use and pricing of natural gas and synthetic natural gas.

---

**37.** EPAA § 2(b), 15 U.S.C. § 751(b) (emphasis added).

**38.** When Congress amended the EPAA in 1975 to provide the President with authority to "decontrol" petroleum products, it refused to allow the EPAA to expire despite an express finding that "[t]here is no longer a general shortage of either crude oil or refined petroleum products." The Conference Committee concluded that "a comprehensive regulatory structure . . . *may* no longer be necessary. On the other hand, to allow such a com-prehensive structure to expire, overnight, may itself create severe dislocations. To the extent that mandatory controls are no longer needed or desirable, a gradual return to an unregulated market is preferable to sudden decontrol." See note 23 *supra*. In determining whether regulation was no longer needed or desirable, the President was directed to consider several factors bearing only on distribution, rather than on supply.

**39.** 10 C.F.R. §§ 210.51, 212.31.

**40.** See note 36 *supra*.

## VI. THE SCOPE OF FEA'S CONDITIONING AUTHORITY

The FEA concedes that it has no jurisdiction over natural gas.[41] The Federal Power Commission has jurisdiction over the interstate movement of natural gas under the Natural Gas Act § 1(b), 15 U.S.C. § 717(b). The intrastate distribution and pricing of natural gas is within the jurisdiction of the Michigan Public Service Commission. Under the Natural Gas Act, "natural gas" includes a mixture of natural and synthetic natural gas;[42] the Michigan Public Service Commission also asserts jurisdiction over mixed natural and synthetic natural gas. The gas produced by Consumers at its Marysville plant is sold as just such a mixture of synthetic and natural gas, but it is not subject to FPC jurisdiction because it is sold, transported, and distributed only intrastate.

The Michigan Public Service Commission has assumed comprehensive jurisdiction over the distribution and pricing of the gas produced at Consumers' Marysville plant. It has issued decisions ordering restrictions on gas sales, including extensions of service to new customers;[43] end use curtailments;[44] and incremental pricing of synthetic natural gas produced at Marysville.[45] On this last matter, the Michigan Public Service Commission states to this court by affidavit that it was at the time of decision, and remains at this time, firmly opposed to the full incremental pricing favored by the FEA.

The particular provisions of the FEA's December 12, 1975 order that are relevant to this aspect of Consumers' request for a preliminary injunction require Consumers (1) to notify certain categories of customers in writing that "Consumers may be required to terminate service on January 1, 1977 to those customers with alternate fuel capabilities on a continuing basis or to those customers which service firms with alternate fuel capabilities on a continuing basis in order to receive SNG feedstock allocations"; (2) to notify FEA by June 1, 1976 of "its efforts to obtain any necessary approval from appropriate regulatory authorities for full incremental pricing of SNG"; and (3) to provide FEA by June 1, 1976 "with data concerning new customers  . . . , increased service to customers  . . . , and whether any new end-users could use alternate fuels on a continuing basis."

The December 12 order was issued pursuant to holdings by the FEA appeal board that the agency has the authority, under the EPAA, "to supersede conflicting state regulations whenever such action is necessary for the effective formulation of a national energy policy."[46] This authority, according to the FEA, includes the discretion to determine that "the general inefficiency of SNG manufacturing shall not be compounded by the allocation of feedstocks to manufacturers which serve customers who have alternate means of satisfying their energy needs,"[47] and to require implementation of incremental pricing as a condition of the allocation.[48] These powers are necessary, FEA believes, to equitably allocate natural gas liquids among competing users, as it is required to do under section 4(b)(1) of the EPAA.

The only relevant provision of the EPAA provides that:

"The regulation under section 753 of this title and any order issued thereunder shall preempt any provision of any program *for the allocation of crude oil, resid-*

---

**41.** *Consumers Power Co., supra* note 6, at 81,111;  10 C.F.R. § 211.

**42.** Natural Gas Act § 2(5), 15 U.S.C. § 717a(5).

**43.** Michigan Public Service Commission (MPSC) Case No. U–3990.

**44.** MPSC Case No. U–4453.

**45.** MPSC Case No. U–4331.

**46.** *General Motors Corp. et al.*, CCH Energy Management [1975 Transfer Binder], ¶ 80,691, at 81,158.

**47.** *Consumers Power Co., supra* note 6, at 81,-111.

**48.** *Petrochemical Energy Group et al.*, CCH Energy Management [1975 Transfer Binder], ¶ 80,712, at 81,236.

*ual fuel oil, or any refined petroleum product* established by any State or local government if such provision is in conflict with such regulation or any such order." EPAA § 6(b), 15 U.S.C. § 755(b) (emphasis added).

This case involves the effect of FEA regulation upon state regulation of natural gas and synthetic natural gas, which FEA concedes to be beyond its direct reach. The statutory preemption provision, which refers only to covered products, offers little assistance in determining whether the FEA's regulatory powers include the authority to condition allocations of covered products upon the use and pricing of an end product, natural gas, which is not subject to FEA regulation.

Once it has been decided that FEA does have the authority to allocate natural gas liquids, at least to the extent necessary to allocate propane and butane as synthetic natural gas feedstocks, it must be conceded that the exercise of this authority will cause a substantial impact upon supplies of natural gas in Michigan. It has been represented to this court that the denial of any allocation of natural gas liquid feedstocks to Consumers would cause the loss of approximately 20 percent of the total natural and synthetic natural gas supplied to Michigan users by Consumers. Such a denial would of course have substantial and foreseeable effects upon the distribution of natural gas within the state.

A governmental agency that is charged with the authority and duty to cause substantial effects upon the supply and distribution of an essential energy resource must have the discretion to consider and evaluate the circumstances surrounding the present use of the end product of that energy resource. "[A]gencies created to protect the public interest must be free, 'within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances.'" *Federal Power Commission v. Louisiana Power & Light Co.,* 406 U.S. 621, 642, 92 S.Ct. 1827, 1839, 32 L.Ed.2d 360, 386 (1972).

In deciding whether to grant an allocation and, if so, how much of an allocation, the FEA must have the freedom to give weight to such factors as the ultimate disposition of that allocation, the extent and nature of state regulation of the synthetic natural gas produced from that allocation, and the responsibility of the producer's requests for pricing and new synthetic natural gas service. It is appropriate for the FEA to take into consideration whether the synthetic natural gas produced from the allocated natural gas liquids will be equitably priced, and it does not exceed FEA's authority to define what price is equitable. Such consideration does not amount to a coercive order requiring the state agency to order full incremental pricing. It would be legitimate, also, for the FEA to consider the quality and nature of the state agency's regulation of synthetic natural gas.

The Michigan Public Service Commission concedes the FEA's authority to consider all of the factors just enumerated. The authority of regulatory agencies to exercise their discretion as set forth above has been upheld in similar cases, although in the context of different statutory mandates. See, e. g., *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1960).

This court therefore concludes that FEA's duty to allocate natural gas liquids to synthetic natural gas plants with due regard for the objectives set forth in section 4(b)(1) of the Emergency Petroleum Allocation Act empowers and requires it to consider such factors as were set forth above, in determining whether to grant an allocation and in designating the volume of that allocation.

It may be noted that, in its present posture, this case does not present the question of whether the FEA may require termination of service to certain customers, full incremental pricing, and implementation of a "no growth" policy as conditions to receiving natural gas liquid feedstocks. The only order which is now before the court on Consumers' request for a preliminary in-

junction is the December 12, 1975 order, which superseded the May 9, 1975 order. The December order requires Consumers to warn certain categories of its natural gas customers that their service may be terminated in 1977. In light of the fact that the FEA does have the power to deny any allocation of natural gas liquid feedstocks to the Marysville plant, such a warning seems desirable. Moreover, if this feared event should materialize, it would be the Michigan Public Service Commission, and not the FEA, that would supervise the redistribution of available supplies of natural gas and synthetic natural gas within the state. The court is not convinced that the assistant administrator overstepped the bounds of appropriate discretionary authority in requiring such notice.

■ It is not clear from the record, however, whether the synthetic natural gas produced at Marysville goes to *all* of Consumers' natural gas customers. On the other hand, the notice required by paragraph 5 of the December 12 order is clearly meant to go to all of Consumers' natural gas customers within certain specified categories. The court has some doubt and has not been briefed on whether the FEA's lawful exercise of its authority to regulate natural gas liquid feedstocks, with the accompanying authority to consider the uses and pricing of its end product, also encompasses the authority to require Consumers to notify customers who do not receive any synthetic natural gas that their natural gas service may be terminated in 1977. Cf. *Northern California Power Agency v. Federal Power Commission*, 168 U.S.App.D.C. 288, 514 F.2d 184 (1975), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92, 44 U.S.L.W. 3204 (1975). Because the court has a serious question about the power of the FEA to base its determination of the amount of natural gas liquid feedstocks for the Marysville plant on the use by Consumers customers of forms of energy not subject to FEA control, a stay of the paragraph 5 notice seems reasonable. It may be that the record shows that all of Consumers custom-

ers receive synthetic natural gas. If that is so, the notice in its present form is appropriate. But if some customers do not use synthetic natural gas or a mixture of natural gas and synthetic natural gas, the court believes that there is a substantial question raised as to the FEA's power to threaten those customers with curtailment of their gas supply. Because further evidence and briefing will be required on this question, paragraph 5 of the December order is hereby stayed for a period of 45 days from the date of this opinion and order.

■ On the other hand, the requirement that Consumers submit the data specified in paragraphs 6 and 7 of the December 12 order seems to be well within the FEA's data gathering authority under the Federal Energy Administration Act. See 15 U.S.C. § 772(b), (c). Furthermore, such data may be essential for the intelligent discharge of FEA's duties under the Emergency Petroleum Allocation Act. Because Consumers has not sustained its burden of proof on these matters, these paragraphs of the December 12 order will not be enjoined or stayed.

A final word may be in order to clarify that this case has not yet, and may not ever, present the question of whether the FEA may go so far as to affirmatively *order* termination of service to certain customers, full incremental pricing, and implementation of a "no growth" gas service policy, as incidents of its power to allocate. The distinction between the power to require such acts as conditions to the receipt of feedstocks and the power to affirmatively order these same acts may be a small one in actual practice, since it is likely that no public utility can afford to run the risk of being denied important feedstocks by gambling that the FEA will not give compliance with one or more of these conditions conclusive weight in granting an allocation. Nevertheless, the distinction is the very real distinction between a passive veto power— the power to deny—and an active ordering power. Compare *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369

(1972) (curtailment), with *Federal Power Commission v. Transco, supra,* (rate-setting). There is no need for this court to further consider the significance of this distinction, however, since it is not before the court.

The motion for a preliminary injunction is accordingly denied, except that paragraph 5 of the FEA's December 12, 1975 order is stayed for 45 days from the date of this opinion and order.

So ordered.

APPENDIX*

HYDROCARBON COMPOSITIONS OF PETROLEUM PRODUCTS

| NAME | FORMULA | BP°F |
|------|---------|------|
| METHANE | $CH_4$ | −258 |
| ETHANE | $C_2H_6$ | −127 |
| PROPANE | $C_3H_8$ | − 44 |
| BUTANE | $C_4H_{10}$ | + 30 |
| PENTANE | $C_5H_{12}$ | + 82 |
| HEXANE | $C_6H_{14}$ | +145 |
| HEPTANE | $C_7H_{16}$ | +200 |
| OCTANE | $C_8H_{16}$ | +228 |
| NONANE | $C_9H_{20}$ | +304 |
| DECANE | $C_{10}H_{22}$ | +345 |
| UNDECANE | $C_{11}H_{24}$ | +383 |
| TETRADECANE | $C_{14}H_{30}$ | +470 |
| TRIACONTANE | $C_{30}H_{62}$ | +580 |

Natural Gas

LPG

Refinery Gases

Natural Gasoline

Condensate

Natural Gas Liquids

Gasoline

Jet Fuel

Kerosene

Naphtha

Fuel Oil

*Prepared by the staff of the Federal Energy Administration.